## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL SCHAEFER ROBERT O'TOOLE; MARC PARKER; BRIAN JORDAN;MARK JACOBS; AND WILLIAM R. SEEHAFER, as trustees of the United Food & Commercial Workers Unions & Employers Midwest Pension Fund, on behalf of the Plan,<br><br>        Plaintiffs,<br><br>        v.<br><br>ALLIANZ GLOBAL INVESTORS U.S. LLC, ALLIANZ GLOBAL INVESTORS U.S. HOLDINGS LLC, ALLIANZ SE, ALLIANZ ASSET MANAGEMENT GMBH, ALLIANZ OF AMERICA, INC., ALLIANZ ASSET MANAGEMENT OF AMERICA HOLDINGS INC., ALLIANZ ASSET MANAGEMENT OF AMERICA LLC, ALLIANZ ASSET MANAGEMENT OF AMERICA L.P., and PFP HOLDINGS INC.,<br><br>        Defendants. | Case No. _____<br><br>**COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff-Trustees of the United Food & Commercial Workers Unions & Employers Midwest Pension Fund ("the Plan" or "the UFCW Plan") bring this Complaint against Defendants Allianz Global Investors U.S. LLC ("AllianzGI"), the Allianz Group Defendants (defined fully below), Allianz of America, Inc., and Allianz SE (collectively, "Defendants" or "Allianz") on behalf of the UFCW Plan.


## NATURE OF THE CLAIMS

1.    Defendants' breaches of fiduciary duties in violation of the Employee Retirement

Income Security Act of 1974 ("ERISA") and operative contracts, other breaches of contract, and willful, reckless, and grossly negligent acts and omissions caused the collapse of a hedge fund, divesting investors of nearly one billion dollars, and causing losses to the UFCW Plan specifically of more than $28 million dollars.

2.      Allianz was the managing member of a series of hedge funds known as the Structured Alpha Funds. Investments in the Structured Alpha Funds were sold and marketed as utilizing an investment strategy designed to provide protection and stable returns during a market downturn. Allianz, the managing member of each Structured Alpha Fund, promised investors that "structural risk protections" were the cornerstone of the Structured Alpha Funds' strategy and that hedges would be in place "at all times" to cap the downside risk of generating returns through an options trading strategy. Allianz claimed these hedges would cabin investment losses to a "defined maximum loss," afford "reinsurance" against a market crash, and *eliminate* the risk of a margin call. Allianz also represented that the Structured Alpha Funds' investment strategy was "non- directional" and would "perform whether equity markets are up or down, smooth or volatile."

3.      Relying on these assurances, in October 2013 the UFCW Plan – acting through its Trustees – invested $22 million of the Plan's assets in a Structured Alpha Fund called Structured Alpha 1000 LLC ("Structured Alpha 1000").

4.      As they always do eventually, equity markets declined and volatility spiked. The promised protections were absent because Allianz abandoned the hedging strategy that was the supposed "cornerstone" of the Structured Alpha Funds, leaving the Structured Alpha portfolio almost entirely unhedged against a spike in market volatility.[1]

---

[1] Prior to liquidation of Structured Alpha 1000 and Structured Alpha 1000 Plus, Allianz's portfolio consisted of 27 Structured Alpha Funds.  As the UFCW Plan understands it, Allianz's investment strategy for each of these funds

5.     Contrary to its purported strategy and representations, Allianz constructed the portfolio to offer no downside protection against the market decline and volatility spike that occurred in February and March 2020. Allianz purchased **no** hedges for an entire segment of the portfolio, and the hedges that Allianz did purchase were not the hedges it promised to buy: Allianz had promised to buy hedges at a strike price 10% to 25% below the market, but the hedges it actually held at the end of February 2020 were as much as 60% below the market. As constructed, and contrary to representations made to the UFCW Plan and similar investors, the portfolio was equipped to earn marginal returns selling insurance against market volatility with *no* meaningful protection against the downside associated with the large tail risk of a market collapse.

6.     These actions violated Allianz's contractual obligations to the UFCW Plan and similar investors, as well as the fiduciary duties it owned to employee benefit plans under ERISA. Allianz further breached its fiduciary duties through its efforts to contain the damage from its imprudent management by adding yet more risk to the portfolio in February and March 2020. As the market began to collapse in February and March 2020, Allianz *sold* the hedges that could have protected the Plan's investment and added more risk-bearing positions in an apparent bet that the market would recover. While the market did recover eventually, the new risk-bearing positions were built without an appropriate hedge in place, exposing the Plan to further, catastrophic losses and a margin call that Allianz had represented could never happen.

7.     Allianz's actions adversely impacted all Structured Alpha Funds, but Structured Alpha 1000 was among the greatest of casualties. Structured Alpha 1000, along with one other Structured Alpha Fund, was liquidated, leaving the UFCW Plan with a total loss of more than

---

was substantially similar, and each fund was to employ the hedging strategy discussed herein, differing only in their return targets.  Structured Alpha and Structured Alpha 1000 were the most aggressive of the funds. The "1000" in their names refer to their return targets: 1,000 basis points or 10 percentage points above their benchmarks.

$28,351,534.10 plus the additional profits that could have been obtained by investing in a different investment.

8.      The resulting losses wiped out virtually all of the Plan's investment in Structured Alpha 1000. As of January 2020, the Plan's investment in Structured Alpha 1000 was valued at $29,149,135.62. By March 25, 2020, Structured Alpha 1000 had lost roughly 90% of its value and Allianz announced that it would be liquidated. Post-liquidation, the UFCW Plan's investment was valued at less than $800,000.00. In March of 2020, the Plan withdrew $797,601.51, all that remained of its investment in Structured Alpha 1000.

9.      As a result of Allianz's breaches, a substantial portion of Plan assets meant to provide retirement security to thousands of participants and their beneficiaries in the UFCW Plan was wiped out.

## PARTIES

10.      Plaintiffs Paul Schaefer, Robert O'Toole, Marc Parker, Brian Jordan, Mark Jacobs and William R. Seehafer, are trustees and therefore fiduciaries of the UFCW Plan, which has its principal offices in Oak Brook, Illinois. Some of these Trustees also executed the Subscription Agreement through which the UFCW Plan invested in Structured Alpha 1000.

11.      Defendant Allianz Global Investors U.S. LLC ("Allianz") is a Delaware limited liability company and registered investment adviser under the Investment Advisers Act of 1940 with a principal office in New York, New York. Allianz is a fiduciary investment manager within the meaning of ERISA § 3(21)(A)(i), (38) (29 U.S.C. § 1002(21)(A)(i), (38)) for the Plan's investment in Structured Alpha 1000. As of December 31, 2019, Allianz managed more than $140 billion in client assets. It is a direct, wholly owned subsidiary of Allianz Global Investors U.S. Holdings LLC and part of "Allianz Global Investors," the marketing name for a

global asset management business operating that utilizes a group of affiliated Allianz entities to operate throughout the world.

12.     Defendant Allianz Global Investors U.S. Holdings LLC ("AllianzGI Holdings") is a Delaware limited liability company with a principal place of business at 1633 Broadway, New York, New York 10019. AllianzGI Holdings is the direct 100% owner of Allianz.

13.     Defendant Allianz Asset Management of America L.P. ("Allianz AMA LP") is a Delaware limited partnership with a principal place of business in Newport Beach, California. Allianz AMA LP is the direct 100% owner of AllianzGI Holdings.

14.     Defendant Allianz Asset Management of America LLC ("Allianz AMA LLC") is the sole general partner of Allianz AMA LP and a Delaware limited liability corporation with a principal place of business in Newport Beach, California.

15.     Defendant PFP Holdings Inc. ("PFP"), a limited partner of Alliance AMA LP, is a corporation incorporated in Delaware with a principal place of business in Newport Beach, California.

16.     Defendant Allianz Asset Management of America Holdings Inc. ("Allianz AMA Holdings") is a Delaware corporation with a principal place of business in Newport Beach, California. Allianz AMA Holdings holds a 0.1% managing equity interest in Allianz AMA LLC.

17.     Defendants Allianz, AllianzGI Holdings, Allianz AMA LP, Allianz AMA LLC, PFP, and Allianz AMA Holdings are members of what Defendants branded and marketed as "Allianz Global Investors." This global asset management business – the Allianz Group (defined below) – is sometimes referred to collectively herein as the "Allianz Group Defendants."

18.     Defendant Allianz SE is a multinational insurance and financial services holding company incorporated and headquartered in Germany. It provides asset management services to

2

82 million clients in over 70 countries and refers to itself and its subsidiaries as the "Allianz Group." Allianz SE holds a direct nearly 75% interest in AMA GmbH and an indirect 100% interest in Allianz of America. According to the Allianz SE statutes, or articles of incorporation, Allianz SE's "corporate purpose" is "the direction of an internal group of companies, which is active in the areas of insurance, banking, asset management, and other financial, consulting, and similar services." Allianz SE, through its control over Allianz Global Investors, Allianz SE engaged in substantial management and business activities associated with the sale, distribution, supervision, and risk management of the Structured Alpha 1000 Fund, as marketed and sold to the UFCW Plan.

19.    Defendant Allianz of America Inc. ("Allianz of America") is a Delaware corporation with a principal place of business in Novato, California, that holds a 99.8% equity, but non-managing, interest in Allianz AMA LLC. Allianz of America is a wholly owned indirect subsidiary of Allianz SE.

20.    Defendant Allianz Asset Management GmbH ("AAM GmbH") is incorporated and headquartered in Munich, Germany, and is the asset management division of Allianz SE. AAM GmbH is the direct 100% owner of Allianz AMA Holdings and holds a 0.1% non-managing interest in Allianz AMA LLC. In 2019, Allianz SE reported €7.164 billion in operating revenue from the Allianz asset management business organized under AAM GmbH, substantially including revenues derived from AAM GmbH's activities and interests in managing the Fund through the operation of Allianz Global Investors, which AAM GmbH controlled at all times relevant hereto. Given AAM GmbH's control and management of Allianz Global Investors, AAM GmbH was responsible for the sale, marketing, operation, and risk management of the Structured Alpha Fund sold to the UFCW Plan.

21.     The operational and personnel overlap of Defendants establishes the principal-agency relationship between each entity and Allianz, which is further evidenced by their shared ownership, shared directors and officers, and unilateral reporting structure. For example, Gemesh Pushpaharan is both the Chief Operating Officer ("COO") and Managing Director of Allianz, and a member of the Executive Committee of AllianzGI Holdings. Paul Koo is both the Chief Compliance Officer of Allianz and a director of AllianzGI Holdings.  Gemesh accordingly executed Allianz's Forms 13G filed with the U.S. Securities and Exchange Commission on behalf of both Allianz and AllianzGI Holdings.

22.     Erin Bengtson-Olivieri, Christopher Cieri, Joseph Quirk, Barbara Claussen, Joseph Schull, John Carroll, David Jobson, Steven Ricci, Frank Garofalo, Bruce Goodman, David Hood, Douglas Forsyth, and Peter Bonanno each held managing director or director positions at both Allianz and AllianzGI Holdings.

23.     Allianz, AllianzGI Holdings, Allianz AMA LP, Allianz AMA LLC, Allianz AMA Holdings, and PFP also have had shared directors and officers, including:

- John Maney: COO and Managing Director of Allianz AMA LP and Allianz AMA LLC and Managing Director of AllianzGI;

- Michael Puntoriero: Chief Financial Officer ("CFO") of Allianz AMA Holdings, AllianzGI Holdings and Managing Director and CFO of Allianz, Allianz AMA LLC, Allianz AMA LP, and PFP;

- James Funaro: Senior Vice President ("SVP") of Allianz, Allianz AMA LP, Allianz AMA LLC, Allianz AMA Holdings, and AllianzGI Holdings and SVP of Tax Matters for PFP;

- Tony Burg: SVP and Treasurer of Allianz, Allianz AMA LLC, Allianz AMA LP, Allianz AMA Holdings, and AllianzGI Holdings;

- Tucker Fitzpatrick: SVP and Secretary of Allianz AMA Holdings, SVP and General Counsel of Allianz AMA LP, and Assistant Secretary of AllianzGI Holdings and Allianz;

- Kellie Davidson: Secretary of Allianz, Allianz AMA LLC, and Allianz AMA LP and Assistant Secretary of Allianz AMA Holdings and AllianzGI Holdings;

- Vinh Nguyen: SVP and Treasurer of Allianz, Allianz AMA LLC, Allianz AMA LP, Allianz AMA Holdings, and PFP;

- John Viggiano: Managing Director and US General Counsel with Allianz, and who previously served as Chief Risk Officer, Head of Compliance and Regulatory Counsel for AAM GmbH; and

- Colleen Martin: SVP and Controller of Allianz, Allianz AMA LLC, Allianz AMA LP, Allianz AMA Holdings, and PFP.

24. The overlapping relationships among employees, officers, and directors of Defendants enabled and is consistent with Allianz's branding.  As discussed in more detail below, Allianz SE's corporate filings explain the important role the ultimate parent company (Allianz SE) plays in establishing and enforcing the risk framework and procedures that failed in the case of the Structured Alpha Funds. For example, Allianz SE's Board of Directors ("the SE Board") is charged with "setting business objectives and the strategic direction, for coordinating and supervising the operating entities, and for implementing and overseeing an efficient risk management system," including "risk controlling processes" set by the SE Board that required "regular reporting to [Allianz] Group."  Board members of both Allianz SE and the Allianz Group sat on a "Group Investment Committee" responsible for "implementing the Group investment strategy, including monitoring group-wide investment activities" and "approving investment-related frameworks and guidelines." According to those filings, Allianz Group runs its "operating entities" – including Defendant subsidiaries that comprise its asset management division – "via an integrated management and control process."  This process involves Allianz Group review of the operating entities' "business strategies and goals."

25. Allianz SE acknowledges its exercise of power over each other Defendant and includes their business activities in assessing its own solvency under applicable European

insurance regulations: according to Allianz Group's 2019 Solvency and Financial Condition Report, Allianz SE exercises a "dominant" influence over, has 100% voting rights in and capital share with, and uses 100% of the financials for the establishment of Allianz Group's consolidated accounts and solvency calculation of Defendants Allianz, AllianzGI Holdings, Allianz AMA LP, PFP, Allianz AMA LLC, Allianz AMA Holdings, and AAM GmbH.  Allianz SE exerts ultimate control over the Allianz Group Defendants.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1332, 1367 and under ERISA § 502(e)(1) (29 U.S.C. § 1132(e)(1)).

27.     Venue in this judicial district is proper under ERISA § 502(e)(2) (29 U.S.C. § 1132(e)(2)) and 28 U.S.C. § 1391(b) because the actions that Allianz and the other Defendants undertook in managing the Fund took place in this District.  Additionally, AllianzGI has consented to the jurisdiction of this Court in Article VI of the Subscription Agreement between Plaintiff and AllianzGI, dated August 20, 2013, which provides that "in the event of any dispute arising out of the terms and conditions of this Subscription Agreement, the parties hereto consent and submit to the jurisdiction of the court of the U.S. District Court for the Southern District of New York."

## FACTUAL ALLEGATIONS
### Allianz Promotes the Structured Alpha Strategy to Investors

28.     Allianz described Structured Alpha as consisting of an "option overlay" that was "designed to exhibit low correlation to the underlying equity or fixed income beta exposure."  In marketing many of its Structured Alpha Funds, Allianz presented them as a goldilocks scenario and a bridge between passive investing (with its lower returns) and active investing (with its greater returns and greater risks). For example, in one presentation, it presented the strategy as

2

"[t]aking a less-traveled road to equity alpha" and delivering "risk-controlled outperformance via an innovative, non-traditional approach."

29.     The Structured Alpha strategy consisted of alpha and beta components. The beta component was intended to replicate the performance of a market index and provide broad-based market exposure to particular asset classes through investments in financial products like exchange-traded funds. The alpha component – the "option overlay" – is an options trading strategy that sought "targeted positive return potential." Allianz represented that it would simultaneously maintain "structural risk protections" as a key element of its strategy. But it did not.

30.     The options strategy remained mostly the same regardless of the specific Fund or its underlying beta(s). Allianz lauded the strategy as "non-directional," meaning it "is not predicated on correctly taking a view on the direction of equities, interest rates or any other fundamental factor." Allianz represented that the Structured Alpha Strategy accordingly would "never make a forecast on the direction of equities or volatility."

31.     Allianz claimed that the Structured Alpha Strategy would "combine[ ] both long- and short-volatility positions at all times," which would serve as "structural risk protection[ ]." While the strategy would "capitalize on the return-generating features of selling options (short volatility)," it would "simultaneously benefit[] from the risk-control attributes associated with buying options (long volatility)," according to Allianz.

32.     The Structured Alpha Strategy was supposed to employ, and was marketed as employing, three types of positions as "building blocks": (1) range-bound spreads; (2) directional spreads; and (3) hedging positions.

33.     **<u>Range-bound spreads.</u>** These were "short-volatility positions" that are "designed

to collect option premium and to generate excess returns in normal market conditions." "Based on detailed, proprietary statistical analysis," "put and call options are sold to create 'profit zones' that have a high probability of success upon expiration of the options." The "profit zones aim to catch the underlying equity index inside their upper and lower bands at expiration." If "the equity index finishes inside the profit zone [of 7-12%, these positions] will profit," according to Allianz. Allianz claimed range-bound spreads generated roughly two-thirds of the strategy's returns.

34.     **Directional spreads.** These "combination long-short volatility positions [were] designed to generate excess returns when equity indexes are rising or declining more than usual over a multi-week period." They "are built by buying and selling options to both the upside and downside to create profit zones several percentage points away from current equity index levels." These spreads "are set up to capture larger equity-market movements" and to "act as portfolio diversifiers." Allianz claimed they accounted for roughly one-third of the strategy's returns.

35.     Allianz depicted the range-bound spreads and directional spreads as follows, with the so-called "profit zones" in blue compared to the "loss zones" in gray:



The charts are not intended to show a certain rate of return or even imply that an investor should expect a positive return. Note that in order to manage any of the Structured Alpha strategies, AllianzGI US will need collateral for the options contracts. In the event that, over a continued period of time, there is a sustained loss in closeout of the options contracts, there is a risk that assets used as collateral for the options would need to be utilized to cover the loss incurred from the closeout of the options contracts. The strategies may utilize various indexes.

36.   **Hedges.** Allianz presented the hedging positions as the third component of Structured Alpha and a "cornerstone" of the strategy. These are "long-volatility positions" that Allianz claimed are "designed to protect the portfolio in the event of a market crash." Allianz claimed it would purchase the hedges "out of the money at various levels to the downside, and always in a greater quantity than the amount of puts sold for the range-bound positions." Allianz emphasized that the "long puts are in place *at all times*" and "*exclusively* for risk-management purposes."

37.   Allianz made a number of false representations about what the hedges and other positions meant and would provide, including statements that a "higher volatility level would enable increased outperformance potential" making a "protracted bear market [ ] a highly favourable environment for our [Structured Alpha] strategy" and that rapid changes in volatility would only result in a few weeks of underperformance followed by "normal levels of expected return" or "*greater* excess-returns potential." Because Allianz both misrepresented the strategy

and failed to hedge and execute as represented, Structured Alpha 1000 was instead liquidated after a short market decline and short period of volatility.

38.    Allianz – including Greg Tournant in videotaped statements – regularly compared the Structured Alpha Strategy to selling "insurance" against market volatility and buying "reinsurance" to protect in the event such volatility was experienced. It explained that the "seller of the option is the insurance company" while the "buyer of the option is the insurance policyholder." Allianz promised to be a "buyer and seller of options at the same time, at all times" and that it was "always *both* the insurance company and the insurance policyholder."

39.    Greg Tournant, the architect of Structured Alpha and Allianz's chief investment officer for U.S. structured products, regularly compared the Structured Alpha strategy to insurance.  For example, in a May 2016 interview, Tournant said that Allianz is "acting like an "insurance company" when it "collect[s] premium" by selling options. He then stressed that if a "catastrophic event" occurred such that the Fund would have to "pay out" akin to an insurer, Structured Alpha's hedging positions would act as "reinsurance" to "protect the portfolio."

40.    Allianz promoted the relationship with its co-defendants – parents, affiliates, and related entities – in marketing Structured Alpha. In May 2010, Allianz (then known as Allianz Global Investors Capital) advertised Structured Alpha as being backed by Allianz SE, "one of the largest financial institutions in the world." Indeed, Allianz touted its "oversight from the parent," claiming that this oversight and relationship made Allianz "different" from other portable alpha strategies. Likewise, Allianz SE represented in annual reports that risk was "continuously managed and monitored" at the "firm level," a fact Allianz promoted in connection with its "unified risk management framework" when promoting Structured Alpha funds.

41.     Allianz further presented that it was supported by an "independent service provider," IDS GmbH-Analysis and Reporting Services, which was a wholly owned subsidiary of Allianz SE. Allianz represented that IDS would provide the Structured Alpha Funds with a "comprehensive range of on-going and consistent performance and risk analysis reports."

## UFCW Invests in Structured Alpha 1000

42.     The Structured Alpha Strategy was first discussed at length with UFCW Trustees at a special meeting on June 4, 2013. Robert Carr, Greg Tournant, Jeff Sheran and Adam Wyatt of AllianzGI participated in the meeting. They explained that the Allianz Structured Alpha Strategy was designed to deliver a target return of T-bills plus 10% annually, net of fees with a low correlation to equity, fixed income and interest rates. They explained this the strategy is a liquid and transparent strategy and that Allianz accepts ERISA investment manager fiduciary responsibility.

43.     The Allianz representatives stated that Allianz currently had approximately $1.5 billion under its Structured Alpha Strategy with different return targets such as Treasuries plus 250 basis points, Treasuries plus 500 basis points and Treasuries plus 1,000 basis points. They stated that the product proposed for the Plan would be the return of T-bills plus 10% net of fees and that Allianz has approximately $237 million under management with that return target.

44.     Consistent with sales pitches to other investors and its public presentations, Allianz represented to the UFCW Plan that the Structured Alpha Strategy employs the purchase and sale of options to pursue sustainable alpha that is nondirectional and is designed to generate consistent returns over all market environments. Allianz claimed that the strategy employs proprietary statistical analysis, which analyzes historical index movements while employing risk management analysis to develop a spread configuration. They stated that the portfolio

construction includes selling put and call options on equity indexes and buying put options to protect against the downside (*i.e.* hedging).

45.     At the conclusion of the meeting, the UFCW Plan Trustees agreed that 2% of the Plan's portfolio would be allocated to the Allianz Structured Alpha strategy, which was to be included within the Plan's hedge fund allocation. Over the course of the following months, the Plan discussed with Allianz the protections it required in order to invest in Structured Alpha 1000, and it was willing to invest only if Allianz assumed fiduciary responsibility for its management of the Plan's investment in the Fund. Concurrent with entry into the Subscription, Allianz and the UFCW Plan worked to finalize a Side Agreement that detailed Allianz's fiduciary responsibilities, executing this agreement on or about October 14, 2013.

46.     Pursuant to Paragraph 11 of the Side Agreement, Allianz affirmed that it was a registered investment advisor under the Investment Advisers Act of 1940 and as such had "discretionary investment authority over the assets of the Fund, during any time in which the assets of the Fund are deemed to be 'plan assets' for purposes of ERISA. It further agreed that during such times the Managing Member "shall" be considered for all purposes a 'fiduciary' as defined by Section 3(21) of ERISA, an 'investment manager' as defined by Section 3(38) of ERISA, and a 'covered service provider' as defined under DOL Regulation Section 2550.408b-2(c)." *See also* Paragraph 10(a)(1).

47.     In assuming fiduciary status under these circumstances, Allianz agreed to "discharge its duties with respect to such assets in accordance with ERISA, including without limitation, the ERISA Fiduciary Standard of Care, prohibited transactions restrictions, and disclosure requirements of Section 408(b)(2) of ERISA." As of the date of execution, "benefit plan investors in the aggregate h[e]ld 25% or more of the value of the Fund and the Fund [was

2

to be] treated as 'plan assets' for purposes of the fiduciary responsibility standards and prohibited transaction restrictions of ERISA."

48. Allianz further assumed under the Side Agreement a contractual obligation for the Managing Member to "use its best efforts to discharge its duties consistent with the standard of care imposed on plan fiduciaries under Section 404(a)(1)(B) of ERISA" even if there was "such time that the assets of the Fund are not treated as 'plan assets' for purposes of ERISA"

49. Although the Prohibited Transaction Exemption 84-14 issued by the DOL under ERISA (the "QPAM Exemption") applies to Allianz and as the Managing Member under the Side Agreement, the QPAM exemption is not applicable to the misconduct at issue here. There are no = other prohibited transaction exemptions set forth in ERISA or issued by the DOL that can immunize Defendants' misconduct either.

50. In addition to being bound by the ERISA Fiduciary Standard of Care, Allianz as the Managing Member agreed to abide by a Contractual Fiduciary Standard of Care under Paragraph 10(a)(i) of the Side Agreement, under which it is required to "act in good faith and carry out its duties to the Fund with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise with like character and with like aims."

51. A limitation of liability under Paragraph 10(a) of the Side Agreement that exempts Allianz for any acts or omissions in the performance of its services in the absence of willful misconduct, gross negligence [and] reckless disregard of its duties" does not apply if "otherwise required by law," and under the express terms of the Side Agreement does not apply if Allianz as the Managing Member "has or exercise[s] any discretionary ERISA fiduciary responsibility" or breaches its Contractual Fiduciary Standard of Care or ERISA Fiduciary

Standard of Care.

52.     The Side Letter specified that indemnification provisions of a Confidential Private Placement Memorandum ("PPM") and other documents  executed between Allianz and the UFCW Plan are subject to Side Letter modifications.  Specifically, Allianz had to satisfy both the ERISA Fiduciary Standard of Care when the assets of the Fund are deemed plan assets and the Contractual Fiduciary of Care – which expressly applies "regardless of whether the underlying assets of the Fund constitute 'plan assets' within the meaning ERISA."

53.     Allianz agreed to "indemnify and hold harmless the Plan from and against any and all claims, losses, costs, expenses (including, without limitation, attorneys' fees and court costs), damages, actions or causes of action directly resulting" from breaches of "the Contractual Fiduciary Standard of Care" and other breaches of fiduciary duties allocated to the Managing Member under [the] Side Letter."[2]

54.     Allianz further agreed "to promptly notify the Member in writing of any material changes in investment objectives, strategies or restrictions and policies (including with respect to leverage…)". Relatedly, in the "Employee Benefit Plan Considerations" section of the Confidential Private Placement Memorandum ("PPM"), Allianz executed with the Plan, it agreed to invest "in accordance with the investment policies and objectives described" therein.[3]

55.     Finally, Allianz agreed to "act in accordance with" the Investment Policy set forth in its PPM. Under that policy, Allianz promised to manage the Trust's investment pursuant to certain investment objectives, including the establishment of "structural risk protections."

---

[2] Allianz was also required to procure and maintain fiduciary liability insurance or trust errors and omissions insurance.

[3] A separate provision in the PPM applicable to other types of investors that states the "Fund will generally follow the investment strategies" but that Allianz may "change any of its investment strategies without prior consent of, or notice to, the Non-Managing Members" is both at odds with and inapplicable to employee benefit plans under the PPM and counter to and superseded by the express terms of the UFCW Plan Side Agreement requiring notice of material changes.

### Allianz Reassures UFCW and Similar Investors About Structured Alpha's Risk-Managed Investment Strategy

56.     In 2014, Allianz updated the PPM. The amendment addressed the types of investments in which the Fund could invest, such as authorizing investment in index futures in a February 2014 update. Nonetheless, the letter to UFCW Plan assured that the changes were in keeping with the investment objectives.

57.     In February 2018, Structured Alpha underperformed relative to its beta benchmarks. Those short-term investment losses were recouped in the following months, and Allianz tried to assure investors its strategy worked as intended. For example, after the 2018 losses, Allianz responded to questions from investor Blue Cross Blue Shield with written representations about how Structured Alpha would work and how it would protect against the risk of losses in a declining market.

58.     Allianz described its hedge positions as the "cornerstone" of the strategy. Allianz represented that these hedges would be "in place at all times, exclusively for risk-management purposes" in order "to protect the portfolio in the event of a market crash." Allianz emphasized that this "tail-risk protection" included "both hedging primarily for a single-day market crash" and "protection in the event of multi-day or multi-week significant declines."

59.     Allianz went even further in describing the hedging positions to Blue Cross. In written communications it described the Structured Alpha's hedging strategy as ***eliminating*** the risk of an "ill-timed margin call," a common concern among investors in options strategies. "***We do not have this risk***," Allianz touted, because of Structured Alpha's "hedging positions." Allianz claimed further that the lack of margin-call risk was a "key benefit of our hedging positions." These statements were consistent with representations Allianz had made publicly to the UFCW Plan and other investors about the strategy's supposed immunity to margin calls. For

2

instance, in an April 2017 pamphlet, Allianz proclaimed that "***under no scenario*** can an equity-market decline cause our portfolio to experience a margin call, a crucial differentiator from many option strategies."

60.     Allianz also misrepresented risks by claiming that the period of increased volatility that typically accompanies a market downturn would provide an attractive environment in which to deploy its options strategy. It claimed that short-term underperformance would be recovered once the initial downturn had been weathered. The UFCW Plan was not so fortunate as Structured Alpha 1000 did not survive the recent very short-lived downturn.

61.     In January 2019, without the UFCW Plan's knowledge, Allianz adopted a new hedging configuration that was supposed to "better protect the options portfolio and guard against costly restructuring when equity markets experience steep declines."

62.     In essence, fewer hedges would be purchased under this configuration, but they would be bought closer to the money when building positions in a low-volatility ("VIX") environment. Doing this was supposed to "create ***self-hedged*** range-bound spreads with a ***defined maximum loss***." Thus, rather than restructure short positions, as Allianz had at times done when markets fell in the past, Allianz would now leave the new-configuration positions alone—they would become "hands-free" and require "no intervention." Allianz sent no update on this material change to the UFCW Plan as required by the Side Letter with the UFCW Plan.

63.     The shift was designed to work as follows:

2









Allianz claimed that these new "sealed" spreads would "[b]etter equip[] the portfolio to handle sharp moves that begin in low-volatility environments" and "[i]mprove[] the portfolio's ability to navigate difficult V-shaped equity and volatility moves" According to Allianz, the new configuration was the product of "almost two years" of research and development.

64.      Based on Allianz's public representations and failure to advise as to material changes and associated risks, the UFCW Plan had no reason to believe Allianz was selling "naked" options, *i.e.*, options without any corresponding hedge in place. But Allianz was doing exactly that. Allianz belied  all of its initial materials and investor communications,  making it appear that it bought a corresponding hedge as "reinsurance" for every option it sold to limit the risk of loss in case the market dropped. Allianz induced the belief that the hedging positions

would be appropriately matched to risk-bearing positions ("reinsuring" the same risk) and that it would never sell any "naked" options.

65.     By the time of Structured Alpha 1000's liquidation in 2020, with no notice of Allianz's true strategy and changes over time thereto, the Plan's investment in the Structured Alpha 1000 Fund represented 3% of its entire portfolio. It lost virtually all of its investment.

**Allianz Abandons the Risk-Managed Investment Strategy It Pitched to the UFCW Plan**

66.     By 2019, Allianz had abandoned the investment strategy it professed to follow. Rather than "maintain[] the risk profile" it knew was critical to the investment of Trust assets by the UFCW Plan and other employee benefit plans, Allianz pursued imprudent actions that added excess and undisclosed risk to the portfolio. These actions placed a directional bet against market volatility and left the portfolio unhedged in a number of market scenarios. Allianz did this to secure additional return but did not advise the UFCW Plan that this material change in strategy was necessary to procure the desired returns.

67.     Allianz was especially motivated to increase returns because this meant more money for Allianz. Allianz did not charge a management fee to operate Structured Alpha. Rather, Allianz received an incentive allocation (30% of the excess of net capital appreciation) based on the Fund's outperformance or underperformance of the B of A Merrill Lynch 3-month U.S. Treasury Bill Index. If the Fund underperformed, Allianz received nothing in compensation.

68.     In order to maintain cheaper puts that would be less of a drag on the fee-generating returns Allianz wanted to produce, Allianz purchased hedge puts that were significantly further out of the money than Alliance had represented they would be. This allowed Allianz to increase its fees by inflating profits from its range-bound while still claiming it was buying hedges. These "hedges" were likely to be worthless in many market scenarios where they

were most needed and did not comport with Allianz's representations that the strategy would work in any type of market.

69.     In addition to breaching its duties by purchasing puts that were further out of the money than represented, Allianz also breached its duties and acted imprudently by buying hedging puts that expired sooner than the risk-bearing options it sold. This heighted the risk of loss because the puts Allianz was purchasing as supposed "reinsurance" expired far earlier than many of the puts it was selling. This created, as Allianz later admitted, a "duration mismatch" between the options Allianz was short and those it was long. By purchasing less expensive, shorter-dated puts and selling more expensive, longer-dated puts, Allianz bought far less "reinsurance" than it had promised. Doing so allowed Allianz to increase the profits from its range-bound and directional spreads, thereby increasing Allianz's fees.

70.     In order to increase its fees, Allianz departed from the strategy it had represented to the UFCW Plan and other investors and, in doing so, Allianz layered excess and undisclosed risk on the portfolio. Allianz was apparently betting that it would be able to effectively replace the hedges as they expired, even in a declining market. But Allianz faced significant risks that it would be unable to backfill the hedges it should have had in place all along.

71.     Allianz's decision not to acquire any hedges for the return-generating options it sold on volatility indexes was an even more significant breach of its fiduciary duties and greater exercise of imprudence. In addition to buying and selling options on an equity index like the S&P 500, Allianz also disclosed that as part of the Structured Alpha Strategy it may buy and sell options on volatility indexes such as the VIX or the iPath Series B S&P 500 VIX Short-Term Futures ETN ("VXX"). Because these options would be part of the return-generating portions of the strategy (and introduce risk as a result), they would also need to be appropriately hedged with

long positions on the VIX to protect against a spike in volatility.

72.     Although Allianz represented "never" making a forecast on the direction of volatility as a pillar of the Structured Alpha investment philosophy, in reality, Allianz was gambling that the VIX would remain relatively low so its unhedged short positions would not be exposed to catastrophic losses.

73.     Allianz took this risk even though it knew the VIX was becoming increasingly sensitive to market movements. In a December 2019 quarterly update, Allianz falsely claimed that the recent "sensitivity of the VIX" was "advantageous" for Structured Alpha. A "typical response," Allianz explained, "is for the VIX to rise 10 to 20 times more than the S&P 500 declines." But Allianz had already observed a VIX increase "100 times larger than the index move" by early December. Despite its knowledge that the VIX was becoming prone in late 2019 and early 2020 to sudden, larger-than-expected increases, Allianz continued to short volatility options—betting that the VIX would remain relatively low—without any corresponding long positions to hedge against a spike in the VIX.

74.     All of Allianz's mismanagement and departures from the strategy and risk neutralization techniques it pitched and represented to investors like the UFCW Plan were motivated by the desire to increase its own fees. Allianz acted out of self-interest, not the best interest of the participants and beneficiaries of the UFCW plan and other employee benefit plans. In each case, Allianz departed from the prudent strategy it had represented to the UFCW Plan, adding excess, undisclosed risk that did not comport with the represented risk parameters that were a predicate for the UFCW Plan's decision to invest in Structure Alpha 1000.

75.     As the market suffered a steep but relatively brief downturn, the UFCW Plan had no idea Allianz had departed from its professed investment strategy and was instead layering

excess risk into Structured Alpha 1000 and each of its other Structured Alpha Funds. If anything, Allianz represented that the portfolio was better positioned to handle a market downturn than it had been in the past.

76.    Rather than being truthful about its departures from and risky investments at odds with its Structured Alpha Strategy, in quarterly strategy updates to investors in 2019 and early 2020, Allianz described one portfolio modification (the "new configuration" hedges), which Allianz said gave the portfolio an "improved ability to navigate sharp market declines that are preceded by low-volatility environments" and "made the option portfolio more resilient." Although it lauded this "refinement[]" to the investment strategy, Allianz did not tell investors of its other changes to Structured Alpha's investment strategy—namely, that it was betting on volatility remaining low, selling naked options, and buying hedges much further below the market than it should have under its professed investment strategy.

## Allianz's Breaches Cause Devastating Losses

77.    Heading into the market turmoil of February and March 2020, Allianz did not have in place hedging positions that could protect the portfolio – as it claimed it would – and it then exacerbated this problem by selling many of the hedges it did have, which it promised not to do. As a result, Allianz caused the UFCW Plan and other investors to suffer catastrophic losses in a matter of weeks.

78.    Throughout January and into late February 2020, the VIX remained relatively low and the S&P 500 remained relatively stable before the market began to decline and volatility spiked in the second half of February and March 2020, as shown in the chart below:





79.     By March 6, 2020, Structured Alpha was already seeing double-digit percentage declines. Yet in communications with investment staff of National Employee Benefits Administrators, Allianz reported optimism about the portfolio's ability to rebound. Allianz acknowledged that some restructuring had taken place but falsely reported that the "cost of these moves was well contained."

80.     Contrary to the sunny picture Allianz was painting, Structured Alpha 1000 was collapsing.  By March 12, Allianz had begun to acknowledge that the "reinsurance" that Allianz promised would be in place "at all times" to protect the Structured portfolio was "not working." Allianz also reported that investments would soon face a margin call, the very risk that Allianz had told Structured Alpha investors they would never face.

81.     If Allianz had been managing the Structured Alpha portfolio in the manner promised, it would have constructed the hedging positions closer to the market and left these

2

hedges intact to secure the defined "Max Loss" if the market declined. That was the "new configuration" strategy—touted as the product of "almost two years" of research and development—that Allianz had promised to deploy in a low-VIX environment like the one that existed for the first six weeks of 2020. Instead Allianz sold the new-configuration hedges—*i.e.*, the hedges that were supposed to be "hands-free" and locked in to contain potential losses. According to Allianz, it had struck the puts "7% to 9%" out of the money. Allianz sold them and replaced them with long puts much further out of the money, gambling that to gamble that the market would rebound immediately and "expos[ing] the portfolio to further downside risk." Allianz's refusal to accept modest losses and recover in a reasonable time period led to Structured Alpha 1000's liquidation. As Allianz later ***admitted*** to Structured Alpha investors, it "***should have left those positions as is***."

82.     The only reason Allianz did not hold the new-configuration hedges and accept modest losses was to increase its own fees in a bet that the market would rebound as Allianz could earn no compensation until those losses were recovered. This was not in the best interest of UFCW plan participants and beneficiaries as the consequence of a miscalculation would be total eradication of the investment in Structured Alpha. This disaster occurred. Allianz removed the hedge that was supposed to protect the Plan's investment and gambled that markets would soon recover but did so with the money of others. Those to whom it owed a fiduciary duty.  In doing so, Allianz not only abandoned the Structured Alpha hedging strategy its investors counted on but also its purported tenet not to bet on the direction of the market.

83.     Allianz made a number of other imprudent decisions that inserted excessive risk into the portfolio and contributed to its collapse.

84.     First, it increased its own fees by purchasing cheap puts much further out of the

money than Allianz had represented. Because these puts were too far out of the money to begin with, they expired with no value in March when the market began to struggle.

85.     Second, Allianz purchased *no* long positions on the volatility indexes it was shorting, leaving the Structured Alpha portfolio at the mercy of a surge in volatility. Allianz left these short positions "naked" even though it knew the VIX had been displaying increased sensitivity to market moves and was prone to abrupt, larger-than-anticipated spikes. The net result was that the portfolio was *short* volatility going into the volatility spikes of February and March 2020, reflecting Allianz's self-serving gamble that the VIX would remain relatively low. Allianz made this reckless directional bet even though the supposed pillar of its investment strategy was that it would "never make a forecast on the direction of equities or volatility."

86.     These actions and other imprudent actions by Allianz with respect to each of the Structured Alpha Funds, caused each Fund to suffer staggering losses by the time the market opened on Monday, March 16. But no Fund suffered more than Structured Alpha 1000. On March 25, Allianz announced that it was liquidating the Structured Alpha 1000, which had lost about 90% or more of its value. Allianz also liquidated the Structured Alpha 1000 Plus fund.

<u>**Allianz Attempts to Conceal Its Breaches**</u>

87.     On July 20, 2020, Allianz published on its website the results of an internal review it claims to have conducted into the "substantial losses" Structured Alpha incurred. The purported purpose of the review, titled "Structured Alpha March 2020 performance," was "to better understand how the Portfolio's investment and risk management processes operated in the face of the market volatility" experienced at that time.

88.     Allianz's account purports to describe certain of its actions in March 2020. "During the eleven trading days between March 2 and March 16," Allianz says, "there were at

least four instances" in which it restructured the short puts on the S&P 500 "by both reducing the strike prices of the put options and by decreasing the number of positions held." "Similarly, the portfolio managers replaced short-term short VIX calls with new longer-term short VIX calls at more distant strike prices. An analogous process occurred for short VXX calls," according to Allianz. But "commencing on March 12, 2020, the Portfolio Management team stopped relayering new short puts on the [S&P 500] and [Nasdaq], and short calls on the VIX and VXX to further reduce the risks in the portfolio."

89.     These admissions only confirm Allianz was betting on a market rebound by continuing to relayer short positions during the critical time period when it should have been mitigating risk rather than compounding it. Allianz's admission further reveals that it was relayering risk-bearing positions all the way until March 12. It was not until that late date that Allianz stopped exposing the portfolio to further losses by refraining from selling more insurance against an additional market decline.

90.     The Structured Alpha March 2020 performance review Allianz claims that Allianz was "obligat[ed] to investors to pursue returns" in the first half of March 2020 rather than "convert[] to cash." But it was not obligated to layer additional risk into the portfolio so it could bet on a market rebound. Allianz had a number of more prudent and appropriated options. For example it could have converted to cash or cash equivalents to assist in the preservation of capital on a temporary basis. It chose the riskiest options because those provided it with the greatest opportunities for gain, while investors suffered the losses if things went wrong.

91.     Allianz's July 2020 report also falsely claims that the risks of investing in Structured Alpha were "fully disclosed, including the risk of total loss." That assertion contradicts Allianz's prior representations of how it would manage the portfolio to avoid

significant losses and promise that Structured Alpha was designed to perform in all type of markets. It also contradicts Allianz's specific representations that one "key benefit" of the hedges was that they eliminated all risk of a margin call.

92. Allianz's report further claims that the hedges were designed to offer only "some protection" in the event of a market crash. Allianz now pretends that the hedges were "not intended to provide broader protection against all market downturns, particularly downturns that transpire over longer periods of time." It says they were only designed to "protect against a *one-day market shock*." But Allianz did not disclose these limitations to the UFCW Plan or other investors. To the contrary, Allianz characterized the hedges to the UFCW Plan as "reinsurance" that would be "in place at all times" in order to "protect the portfolio in the event of a market crash."

93. In initial presentations to the UFCW Plan and its consultants, as well as to other employee benefit plans, Allianz's investment strategy addressed "two risks: the overnight market crash *and the multi-week market correction*." Allianz said its "tail-risk protection" "includes both hedging primarily for a single-day market crash as well as better *protection in the event of multi-day or multi-week significant declines*." Allianz bolstered these claims about protection against multi-week declines with stress testing purporting to show that the strategy would yield positive returns during market shocks that took weeks or even months to transpire. Allianz's retroactive description of the hedges as a mere partial backstop—protecting only against a "one-day market shock" but nothing else—is grossly at odds with its prior representations to its investors.

94. Allianz's July 2020 report also claims that Allianz's "Enterprise Risk Management function" stress tested the portfolio against "*single day* scenarios" only. Single-day

2

stress testing underscores Allianz's imprudence: such testing would not permit Allianz to evaluate or manage risk in a multi-day or multi-week market decline, rendering the entire risk asset and presumptions on which Structured Alpha was predicated void. Contrary to Allianz's July 2020 report, Allianz had previously assured investors that its "Enterprise Risk Management" team was responsible for "weekly risk profiles" and that Allianz's "proprietary tools and models" enabled it to "stress-test the entire portfolio for *any* market scenario"—models Allianz claimed were "integral to the successful day-to-day management of Structured Alpha."

95.    Again, Allianz's postmortem is inconsistent with the risk profile of Structured Alpha that Allianz initially disclosed and represented to the UFCW Plan as well as all other investors and in its promotional materials.

96.    Allianz also included in its July 2020 report a graph providing a "representative depiction of a portion of the composition of the Structured Alpha 1000 fund" as of "February 2020":



**Example of payoffs by strategy in the Structured Alpha 1000 Fund for S&P 500 options**
February 2020



97.    This investment strategy depicted in this graph is at odds with the one Allianz assured the UFCW Plan and other employee benefit plans it would follow to pursue "risk-managed returns." Allianz never disclosed this graph—or anything like it—when pitching the Structured Alpha strategy to the UFCW Plan in 2013 or in any of the succeeding years prior to Structured Alpha's dreadful results in 2020. If it had, the UFCW Plan would not have maintained its significant investment in Structured Alpha 1000, which reached 3% of its entire portfolio.

98.    Allianz's July 2020 graph illustrates that Allianz bought downside hedges well beneath the strike price (*i.e.*, "-10% to -25%" below-the-market level) at which it said it would buy hedges. Allianz's claims this was "deliberate[]" only meant that it deliberately breached its fiduciary duty and departed from its purported investment strategy by declining to buy the hedges, leaving the Funds exposed to the catastrophic losses that occurred in February and March 2020.

99.    Allianz's July 2020 graph also confirms the absence of any new-configuration

hedges, *i.e.*, the hedges that Allianz said it would buy closer to market levels in order to lock in a "Max Loss" in the case of a market decline. These hedges do not appear anywhere in in Allianz's graph, and there is no discussion of them in Allianz's commentary even though Allianz had said it had deployed this "refinement" to its investment strategy to make the portfolio "more resilient" to market declines.

100.     Allianz's July 2020 graph also shows that potential returns from the options strategy (illustrated in blue in the annotated version of Allianz's graph below) came with the significant risk of potentially massive, unhedged losses (illustrated in red below) if the market declined. The downside exposure depicted in Allianz's July 2020 chart is contrary to Allianz's description of Structured Alpha's investment strategy to the UFCW Plan, including its representation that hedging positions eliminated all risk of a margin call.



Despite the existing graph's confirmation of Allianz's breaches, Allianz chose not to illustrate the "strategy payoffs" from the short volatility options it sold on the VIX and VXX in violation

2

of its promise "never" to make a bet on the direction of volatility. If such a graph had been included, it would underscore the potential for fairly small payoffs if Allianz bet correctly and ***unlimited*** losses if it did not. Allianz has made no attempt to explain why it made this risky bet with the money of others, or how the disastrous losses it caused were consistent with the investment strategy Allianz claimed to pursue on behalf of the UFCW Plan and other investors in Structured Alpha Funds.

## CAUSES OF ACTION

## COUNT I: NEGLIGENCE

101.    Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

102.    Allianz owed a duty of care to the UFCW Plan to manage its investment in the Structured Alpha 1000 Fund as a reasonably prudent investment manager would do under similar circumstances, including to implement the risk management and hedging strategies it represented both before and during the Plaintiffs' investments.

103.    In its updated PPM, Allianz agreed to use its best efforts to discharge its duties consistent with the standard of care imposed on plan fiduciaries under Section 404(a)(l)(B) of ERISA even if there was a time when the assets of the Structured Alpha 1000 Fund were not treated as Plan Assets. In doing so, it agreed to "exercise the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." The Side Letter with UFCW further affirmed these responsibilities.

104.    Allianz further agreed in its PPM that it would be liable to Plaintiffs for "losses arising from . . . [its] bad faith, willful misconduct, or negligence" and that limitations on

liability do not apply to bad faith, willful misconduct, or negligence.

105.     Plaintiffs detrimentally relied on Allianz's representations of how it would manage the Structured Alpha 1000 Fund, in particular how it would manage and hedge against risk during times of market volatility.

106.     Allianz breached its duty of care by failing to implement its hedging strategy designed to minimize loss and maximize profits even during sharp market downturns; taking on additional risk at a time when a prudent investment manager would be reducing risk; failing to liquidate or at least reduce its positions in risky short SPX puts and short VIX and VXX calls; failing to implement the risk management protocols outlined in its presentations; and failing to conduct adequate stress tests, risk assessments, and real-time monitoring of positions, or ignoring the data produced by these activities if they were conducted.

107.     Defendant Allianz SE, as a principal, is liable for the actions of AllianzGI, its agent, under principles of agency and respondeat superior. At all relevant times, Allianz SE exerted a "dominant" influence over and controlled AllianzGI.  At all relevant times, AllianzGI acted within the scope of its role as Allianz SE's agent.

108.     As a direct result of Allianz's mismanagement of the Structured Alpha 1000 Fund and its breach if its duty of care, the UFCW Plan suffered actual damages in an amount to be determined at trial, but exceeding $75,000. In fact, the UFCW Plan appears to have suffered at least $22,000,000 in damages.

## COUNT II: BREACH OF CONTRACT

 Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

109.     Allianz and the UFCW Plan were parties to lawful contracts executed between 2013 and 2014.

110.    The PPM obligated Allianz to engage in a strategy to "consist of investments in puts and calls on equity indices through the use of a proprietary model to construct option spreads" with the "objective [of] creating option based profit zones that, upon expiration of the options, will capture positive payoffs if the level of the underlying index (or other instrument) ends up within the profit zone." Allianz was obligated to "to optimize spread positions and profit zones based on (a) targeted positive return potential, (b) structural risk protections, (c) collateral management, and (d) flexibility to restructure profit zones if necessary." Allianz failed to do so.

111.    Among other things, Allianz failed to structure adequate spread and risk positions, appropriately manage collateral, and restructure profit zones.

112.    In its Side Letter with the UFCW Plan, Allianz agreed to "inform [the Plaintiffs] promptly in writing of . . . any material change in the investment strategies disclosed in the Company Documents." Allianz failed to do so.

113.    In its PPM, Allianz agreed to "develop the appropriate systems and procedures to control operational risk" including risk management systems. Allianz failed to develop appropriate risk management systems and failed to adequately utilize any systems or implement its findings to the extent any were in place.

114.    The UFCW Plan complied with all of its obligations under the PPM, Subscription Agreement, and Side Letter.

115.    Defendant Allianz SE, as a principal, is liable for the actions of Allianz, its agent, under principles of agency and respondeat superior. At all relevant times, Allianz SE exerted a "dominant" influence over and controlled Allianz.  At all relevant times, Allianz acted within the scope of its role as Allianz SE's agent.

116.    As a direct result of Allianz's breaches, the UFCW Plan suffered actual damages

2

in an amount to be determined at trial, but exceeding $75,000. In fact, the UFCW Plan appears to have suffered at least $22,000,000 in damages.

### COUNT III: BREACH OF FIDUCIARY DUTY

117.   Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

118.   A fiduciary relationship was created between Allianz and the UFCW Plan by virtue of Allianz's service as the Managing Member and investment manager of Allianz Structured Alpha 1000 LLC, a Delaware limited liability company. In this role, Allianz undertook the responsibility to invest the UFCW Plan's assets prudently and in so doing, to also exercise the utmost good faith and undivided loyalty toward the UFCW Plan throughout the relationship.

119.   Allianz expressly agreed to act as a fiduciary.  Allianz agreed that "for so long as the assets of the [SA 1000] Fund are treated as 'plan assets' for purposes of ERISA, the Managing Member would be an "ERISA fiduciary with respect to the Fund" and that it would accordingly "discharge its duties with respect to such assets in full compliance with its obligations under the prudence standards of ERISA" The Side Agreement defined this obligation as the ERISA Fiduciary Standard of Care."

120.   Allianz also agreed that "[d]uring any such time that the assets of the Fund are not treated as 'plan assets' for purposes of ERISA . . . the Managing Member nevertheless will use its reasonable best efforts to discharge its duties consistent with the standard of care imposed on plan fiduciaries under Section 404(a)(1)(B) of ERISA."

121.   The PPM further states that Allianz's "[c]onduct outside the safe harbor afforded by Section 28(e) [of the Securities Exchange Act of 1934] is subject to the traditional standards of

fiduciary duty under state and federal law."

122.    Allianz further agreed to act in accordance with a Contractual Fiduciary Standard of Care under which it was obligated to act in good faith and carry out its duties to the Fund with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" and it agreed to satisfy this standard "regardless of whether the underlying assets of the Fund constitute 'plan assets' within the meaning of Section 3(42) of ERISA.

123.    The UFCW Plan relied on Allianz to manage and invest its assets in good faith, prudently and with the skill and care of a fiduciary of an investment manager and the Managing Member of the Structured Alpha 1000 Fund, which was organized as a Delaware limited liability company. The UFCW Plan relied on Allianz to adhere to both fiduciary standards of care. Allianz accepted that trust as evidenced by, among other things, the terms of the Structured Alpha 1000 Agreements and its serving as the Managing Member.

124.    Allianz violated its duty of care by imprudently failing to exercise appropriate caution in a volatile marketplace and by deviating from the stated strategy of the Fund. Specifically, Allianz acted to enhance its own returns in a manner that placed the Plaintiffs at risk of total loss of their investment by declining to de-risk the Structured 1000 Fund's portfolio by continuing to sell put options during a market dislocation rather than attempting to liquidate positions in order to stop losses; abandoned the explicit strategy whereby Structured 1000 operates as a "net buyer" of put options rather than selling such contracts; failed to implement the hedging strategy designed to minimize loss and maximize profits even during sharp market downturns; failed to conduct adequate stress tests, risk assessments, and real-time monitoring of

positions, or ignoring the data produced by these activities if they were conducted; and sought to maximize its own profits by recklessly assuming highly risky positions and in the process putting the Plaintiffs' investments at unreasonable risk of loss.

125.   Defendant Allianz SE, as a principal, is liable for the actions of Allianz, its agent, under principles of agency and respondeat superior. At all relevant times, Allianz SE exerted a "dominant" influence over and controlled Allianz. At all relevant times, Allianz acted within the scope of its role as Allianz SE's agent.

126.   As a direct result of Allianz imprudent mismanagement of the SA 1000 Fund and its breach if its duty of care, the MTA Plaintiffs suffered actual damages in an amount to be determined at trial, but exceeding $75,000. In fact, the UFCW Plan appears to have been damaged in the amount of at least $22,000,000.

## COUNT IV: VIOLATION OF SECTION 404(a)(1)(B) OF ERISA

Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

127.   Section 404(a)(1)(B) of ERISA states that "a fiduciary shall discharge his[/her] duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

128.   Allianz agreed in the PPM that "for so long as the assets of the Fund are treated as 'plan assets' for purposes of ERISA, the Managing Member is a 'fiduciary,' as such term is defined by ERISA."

129.   Allianz agreed that "to the extent that the underlying assets of the Company constitute 'plan assets' within the meaning of ERISA . . . [Allianz], in its capacity as 'investment

manager' of the Company . . . shall at all times discharge its duties consistent with the standard of care imposed on fiduciaries under ERISA and/or Section 4975 of the [Internal Revenue] Code."

130.    Allianz also agreed in its Side Letters that "during such times when the Fund is deemed to hold 'plan assets' . . . it would "be considered for all purposes as an ERISA fiduciary with respect to the Fund and the Managing Member shall discharge its duties with respect to such assets in full compliance with its obligations under the prudence standards of ERISA ("'Fiduciary Standard of Care')."

131.    In addition, Allianz agreed in the PPM that "[d]uring any such time that the assets of the Fund are not treated as 'plan assets' for purposes of ERISA . . . the Managing Member nevertheless will use its best efforts to discharge its duties consistent with the standard of care imposed on plan fiduciaries under Section 404(a)(1)(B) of ERISA."

132.    In the LLC Agreement, Allianz agreed to "[t]o the extent that the underlying assets of the Company do not constitute Plan Assets [under ERISA], Allianz Global Investors U.S. LLC, in its capacity as 'investment manager' of the Company . . . shall at all times use its reasonable best efforts to discharge its duties consistent with the standard of care imposed on fiduciaries under Section 404(a)(1)(B) of ERISA." The SA 1000 Fund held plan assets at all relevant times, in particular during the months of January, February, and March 2020, because benefit plan investors held more than 25% of the SA 1000 Fund's equity interest during that time. Indeed, Allianz affirmatively stated that employee benefit plans held more than 25% of the SA 1000 Fund's equity interest at the time the UFCW Plan executed the Subscription Agreement.

133.    The investors' interests in the Structured Alpha 1000 Fund were not publicly-offered securities or securities issued by an investment company registered under the Investment

Company Act of 1940. The Structured Alpha 1000 Fund was not an operating company, as defined by ERISA.

134.    Allianz exercised authority and control respecting the management and disposition of the Structured Alpha 1000 Fund's underlying assets, including the assets of the UFCW Plan.

135.    As per the terms of the Structured Alpha 1000 Agreement, Allianz owed the UFCW plan a fiduciary duty pursuant to Section 404(a)(1)(B) to, among other things, discharge its duties with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

136.    Allianz violated this duty of care by failing to act as a prudent and diligent fiduciary would in like circumstances. Specifically, Allianz:

    a.  Failed to de-risk the Structured Alpha 1000 portfolio by liquidating or reducing risky positions, including its positions in short SPX put options and short VIX and VXX call options;

    b.  Failed to adhere to its explicit strategy whereby Structured Alpha 1000 operates as a "net buyer" of put options rather than selling such contracts;

    c.  Failed to implement the hedging strategy designed to minimize loss and maximize profits even during sharp market downturns;

    d.  Failed to conduct adequate stress tests, risk assessments, and real-time monitoring of positions, or at least heed the data produced by these activities if they were conducted;

    e.  Sought to maximize its own profits by unreasonably assuming directional risk and in the process putting the Plaintiffs' investments at unreasonable risk of loss.

137.    Defendant Allianz SE, as a principal, is liable for the actions of Allianz, its agent, under principles of agency and respondeat superior. At all relevant times, Allianz SE exerted a

2

"dominant" influence over and controlled Allianz.  At all relevant times, Allianz acted within the scope of its role as Allianz SE's agent.

138.    UFCW Plan suffered actual damages in an amount to be determined at trial, but exceeding $75,000. In fact, the UFCW Plan appears to have suffered damages in the amount of at least $22,000,000.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

a.   A declaration that the Defendants are liable for negligence in connection with the mismanagement of the Structured Alpha 1000 Fund, causing the UFCW Plan's losses;

b.   A declaration that the Defendants are liable for breach of contract, causing the Plaintiffs' losses;

c.   A declaration that the Defendants are liable for breach of the fiduciary duty they owed to the UFCW Plan, causing the UFCW Plan's losses;

d.   A declaration that the Defendants breached the fiduciary duty they owed to the UFCW Plan under ERISA, causing the UFCW Plan's losses;

e.   A money judgment against Defendants in an amount exceeding $75,000.00, to be determined at trial;

f.   Punitive damages and a declaration that Allianz and its co-defendants acted with malice, including with malice as defined in the parties' Side Letter;

g.   Accounting and disgorgement of fees and profits, in an amount to be proven at trial;

h.   Attorney's fees and costs under ERISA § 502(g) (29 U.S.C. § 1132(g)) and the parties' Side Letter;

i.   An Order awarding pre- and post-judgment interest to UFCW Plan; and

j.   Any other relief the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

Dated:  November 13, 2020                                 Respectfully submitted,

                                              **GUTTMAN, BUSCHNER & BROOKS PLLC**

                                           /s/ Justin S. Brooks
                                         Justin S. Brooks
                                         jbrooks@gbblegal.com
                                         119 Coulter Ave., Suite 211
                                         Ardmore, PA 19003
                                         Tel: 610-547-9556
                                         Fax: 202-827-0041

                                         Elizabeth H. Shofner
                                         lshofner@gbblegal.com
                                         41-30 46th Street, Apt. 1-O
                                         Sunnyside, NY  11104
                                         Tel: 202-800-3001
                                         Fax: 202-827-0041

                                         Reuben A. Guttman*
                                         rguttman@gbblegal.com
                                         2000 P Street, N.W., Suite 300
                                         Washington, DC 20036
                                         Tel: 202-800-3001
                                         Fax: 202-827-0041

                                         Jonathan D. Karmel*
                                         jon@karmellawfirm.com
                                         **KARMEL LAW FIRM**
                                         221 N. La Salle Street, Suite 1550
                                         Chicago, IL 60601
                                         Tel: 800-459-6264
                                         Fax: 312-641-0781

                                         Kenneth A. Wexler*
                                         kaw@wexlerwallace.com
                                         Mark J. Tamblyn*
                                         mjt@wexlerwallace.com
                                         **WEXLER WALLACE LLP**
                                         55 W. Monroe Street, Suite 3300
                                         Chicago, IL 60603
                                         Tel: 312-346-2222
                                         Fax: 312-346-0022

*Pro Hac Vice* Motions to be filed shortly.